[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 969 
Homer Leonard Raines was indicted for the murder of Ricky Stinson. A jury convicted him of manslaughter. Sentence was ten years' imprisonment.
 I
Raines' 1978 conviction for carnal knowledge was a crime involving moral turpitude. See William v. State, 55 Ala. App. 436, 316 So.2d 362 (1975). Evidence of this conviction was properly admitted to impeach his credibility. Alabama Code §12-21-162 (1975). Whether the prior conviction is too remote in time to have any present probative value toward showing a witness's lack of credibility is a matter within the sound discretion of the trial judge under the facts and circumstances of *Page 970 
each particular case. McDaniel v. State, 365 So.2d 350, 351
(Ala.Cr.App. 1978).
 II
At the beginning of the trial, the judge read the indictment and gave the jury general instructions on the presumption of innocence, the meaning of intent, and the course the trial would follow. This is an approved and accepted practice. SeeGaston v. State, 359 So.2d 1170, 1171-72 (Ala.Cr.App. 1978). The judge did not make any comment on the facts of the case, and his failure to instruct on potential defenses was not error. See 23A C.J.S. Criminal Law § 1299 (1961).
 III
Raines raises several allegations of error which involve the issue of whether or not there was any evidence of self-defense. The trial judge "took the position that as a matter of law in this case there had been no evidence that would permit the Defendant to invoke self-defense." We agree.
The State's evidence showed that James Neese had threatened to kill Raines. On the night of June 30, 1984, Ralph Robert Gomillion, unaware of Neese's intentions, rode with Neese and directed him to Raines' trailer. Gomillion testified that Neese drove past the trailer, turned around, and "(g)ot right below the trailer and . . . fired some shots out the window."
In contradiction of Gomillion's testimony, State's witness Sharon Quates, who was living with Raines, testified that around 9:30 that evening a white car drove by Raines' trailer. When the car returned, "it stopped right in front of the trailer and it started shooting at the trailer." The car was parked in the driveway and three shots were fired. No shots hit the trailer. Raines arrived home about 11:30 and Quates told him what had happened.
Ten minutes after Raines had returned to the trailer, Quates and Raines heard a car approaching. They went outside and Quates identified it as "the same car." Quates testified that Raines told her that "he'd just shoot the tire out and stop it and we'd go get the law and find out who it was." Raines then shot five times with a Ruger "Mini 14" semiautomatic rifle.
In a voluntary statement Raines gave to the Deputy Sheriff after his arrest, Raines stated, "When the car came by Sharon said it was the same car. I told her that I could stop them and Leroy could come out and see who it was. Then I shot the car." Raines admitted that when he fired the car was "just past the trailer . . . . at a power pole just up from the driveway."
Neese fled from the car which had crashed in a ditch. A .45 semiautomatic pistol was found in the car. A .44 caliber revolver was found in the area where Neese fled.
Ricky Stinson was found dead on the passenger's seat of the car. A bullet had entered his head just in front of his right ear and exited his left forehead.
There were a number of bullet holes in the front windshield. Two expended pistol cartridges were found in the dirt road. A third expended pistol cartridge was found in the car. Five expended rifle cartridges were found in Raines' driveway in front of the trailer.
Raines testified in his own defense that when he heard the car coming he turned out the lights and went outside "so he couldn't shoot at us again and see the lights." As the car went past his house he "shot at the back of it. Pointed the gun at it and shot at the back of it. . . . Because I got kids and I can't have nobody shooting towards my house and other people come there too."
Raines stated that when he fired he was in fear of his own safety and that of others but admitted that the people in the car had not done anything or taken any action other than "riding by on that road." Ms. Quates and Billy Kendrick had told him that Neese was going to try to kill him.
Raines lived on a public dirt road which connects County Road 29 with Highway 83 in Conecuh County. Raines' father lived about two and one-half miles from Raines. *Page 971 
Theirs were the only residences on the road. A deputy sheriff testified that on the night of the shooting the road became impassable about one-half mile past Raines' trailer because "it was wet and the log trucks had been hauling logs and it had deep ruts in the road."
Neese testified as a defense witness. He stated that he went past Raines' trailer "just to see if her (Quates') truck was there" because Quates had told him that Raines was "setting him up." He admitted firing his pistol "down that dirt road below the house" but denied shooting at the trailer and stated that he had never threatened to kill Raines.
Stinson rode with Neese the second time he went to Raines' trailer because Stinson knew where Raines lived and could identify Quates' truck. Neese testified that they were past the trailer, riding down a public road when "somebody opened fire on us."
A person may use physical force "to defend himself or a third person from what he reasonably believes to be the use orimminent use of unlawful physical force." Alabama Code §13A-3-23 (a) (1975) (emphasis added). In the circumstances of this case, there is no evidence to show that Raines fired in response to the imminent use of deadly physical force.
 "Imminent danger. In relation to homicide in self-defense, this term means immediate danger, such as must be instantly met, such as cannot be guarded against by calling for the assistance of others or the protection of the law. Or, as otherwise defined, such an appearance of threatened and impending injury as would put a reasonable and prudent man to his instant defense." Black's Law Dictionary 676 (5th ed. 1979).
See also C. Gamble, McElroy's Alabama Evidence § 457.02 (1) (3rd ed. 1977), which states:
 "(b) `Actual imminent peril' means that the accused, at the time he did the homicidal act, was in danger of immediately being killed or seriously harmed in body by the deceased. This is true though the accused neither reasonably nor honestly believed himself to be in such danger.
 "(c) `Apparent imminent peril' means that the circumstances and conditions perceived by the accused at the time he did the homicidal act were such as would have reasonably impressed a reasonable person that the accused was in danger of immediately being killed or seriously harmed in body by the deceased; and that the accused honestly believed himself to be in such danger though, in truth, he was not in such danger."
"The danger, or apparent danger, must be present, not prospective, — not even in the near future. . . . Human life must not be sacrificed under the apprehension of a prospective probable danger even in the near future." Dolan v. State,81 Ala. 11, 1 So. 707, 712 (1887). A mere fear, though well-grounded, of personal violence about to be committed, is no justification unless the danger appears to be imminent or threatening. See Dupree v. State, 33 Ala. 380 (1859). "[T]he defendant must entertain an honest belief that he is in actual danger at the time he strikes." Owen v. State, 17 Ala. App. 29,81 So. 365 (1919).
Threats of violence accompanied by an overt act may justify one assaulted in acting more promptly on the appearance of things under the doctrine of apparent imminent peril. Daniel v.State, 14 Ala. App. 63, 68-9, 71 So. 79, cert. denied, Ex parteDaniels, 196 Ala. 700, 72 So. 1019 (1916). Although the law recognizes the right of one who has received threats to "act more promptly and on slighter overt act or demonstration than it would in the absence of such proof", this principle is confined exclusively to defensive measures. Langham v. State,12 Ala. App. 46, 52, 68 So. 504, cert. denied, 192 Ala. 687,68 So. 1019 (1915).
 "It is also a well-established doctrine that when the deceased has made threats against the defendant, and which have been communicated to him, he is not thereby authorized to commence an attack or to act upon said communicated threats until the deceased has committed *Page 972 
some overt act or made some hostile demonstration; but in such case the law allows the threatened party to act with greater dispatch and upon a perhaps slighter overt act than is required on the part of a defendant who was not threatened by the deceased, or between whom and the accused there was no bad blood or ill will. The mere fear of an attack will not justify action on the part of the defendant; and he cannot avail himself of communicated threats until he first shows some overt act or hostile demonstration on the part of the deceased which would be calculated to reasonably impress upon him the bona fide belief that he was in imminent peril. This does not mean that the supposed facts generating the belief must be real; for they may be appearances only, and yet justify as prompt action as if they were real. "But this principle is confined to defensive measures. It furnishes no excuse or palliation for aggressive action, nor when the difficulty is brought on or sought by the accused." Beasley v. State, 181 Ala. 28, 61 So. 259, 260 (1913) (citations omitted).
The overt act or hostile demonstration need not have amounted to a felonious assault. George v. State, 145 Ala. 41,40 So. 961 (1906). Yet, "however bad or desperate [the] character [of the deceased] may be, and however many threats such person may have made, he forfeits no right to his life, until by an actual attempt to execute his threats, or by some act or demonstration at the time of killing, taken in connection with such character or threats, he induces a reasonable belief on the part of the slayer that it is necessary to deprive him of life in order to save his own, or to prevent some felony upon his person."Pritchett v. State, 22 Ala. 39, 42 (1853).
 "No one has a right to kill another simply because he has made threats against him. . . .
 "Threats previously made do not justify taking the life of the person uttering them on the plea of self-defense, unless there was, at least apparently, such a demonstration of an immediate intention to execute them as would naturally induce a reasonable belief that the person threatened would lose his life or suffer serious bodily harm if he did not immediately take the life of the person making them." F. Wharton, The Law of Homicide § 242 (3rd ed. 1907).
"There must be some demonstration, or apparent demonstration, of an intent, coupled with ability, to take life or inflict grievous bodily harm, before extreme measures become defensive, and can be resorted to." Karr v. State, 100 Ala. 4, 14 So. 851,852 (1894).
A hostile demonstration or overt act is defined as:
 "any [act] which manifest[s] to the mind of a reasonable person a present intention to kill the person against whom they are directed, or to do him great bodily harm. . . . To be sufficient to justify killing the threatener in self-defense, they must be such as are reasonably calculated to induce the belief that the execution of the threatened act or attack has been actually commenced. Mere acts of preparation to execute the threat at some other time, immediate or remote, are not sufficient. They must show an immediate intention to act." Wharton, § 251 (footnotes omitted).
Here, Neese and Stinson were only driving down the public road in front of Raines' house when Raines fired five shots from a semiautomatic rifle. Raines admitted that when he fired, the car was already past his trailer.
Here, there is no evidence of a hostile demonstration or an overt action such as to induce a reasonable belief of real or apparent imminent peril. Consequently, there was no justification for shooting in self-defense.
"One assaulted in his house need not flee therefrom. But his house is his castle only for the purposes of defense. It cannot be turned into an arsenal for the purposes of offensive effort against the lives of others. It is a shelter, but not a sally-port." Watkins v. State, 89 Ala. 82, *Page 973 8 So. 134, 136 (1890). Here, there was simply no necessity for the killing or even the shooting. In the absence of the necessity of taking life, a plea of self-defense cannot stand.McGee v. State, 25 Ala. App. 232, 144 So. 112 (1932).
Although Raines may well have been in fear of danger when the white car approached, such fear alone did not justify his firing at the car as it drove down the public road past his trailer. "A mere fear or belief on the part of accused that he will suffer great bodily harm or loss of life in the future, as distinguished from the present, does not constitute a justification or excuse." 40 C.J.S. Homicide § 123 (b) (1944).
 IV
Defense witness Richard Lynch testified that on the evening of the shooting, Neese made threats against Raines. The trial judge properly directed the jury to disregard this testimony.
"In a charge of homicide or assault, the accused may prove a threat by the victim against him as tending to show that the victim was the aggressor. . . . These threats are admissible even though the accused had no knowledge of them before the now-charged crime." C. Gamble, McElroy's Alabama Evidence § 44.02 (2) (3rd ed. 1977). However, threats by the victim against the accused "can only be proven after the accused has introduced evidence warranting a finding by the jury that he acted in self-defense. * * * A threat by the victim is not admissible if, at the time it is offered, the undisputed evidence shows that the accused was at fault in bringing on the difficulty or was not in imminent peril of losing his life or suffering serious bodily harm." McElroy, § 44.02 (2) (footnotes omitted).
In excluding Lynch's testimony from the jury's consideration, the trial judge specifically found that there had been no evidence that Raines was acting in self-defense: "Its been no evidence that these people were shooting at the time he [Raines] went out there and shot and the mere fact somebody had ridden by there thirty minutes or fifteen minutes or an hour before when he wasn't even at home wouldn't make self-defense." Since there was no evidence of self-defense as a matter of law, there was no error in the exclusion of Lynch's testimony. For this same reason there was no error in the trial judge's refusal to allow defense counsel to elicit Billy Kendrick's testimony that Neese had threatened Raines.
There is no merit in the State's argument that the exclusions of the threats were not error because the threats were made by Neese, not Stinson, the actual victim. The State contends that since Stinson, the victim, made no threats against Raines, threats made by Neese were not admissible to prove that Stinson was the aggressor.
 "If the killing of a person intended to be killed would, under the circumstances, have been excusable or justifiable homicide for any reason, then the unintentional killing of a bystander or other third person is also excusable and justifiable." Wharton, § 363.
If there had been evidence that Raines was acting in self-defense in shooting at Neese and that Stinson was accidentally killed, then the threats made by Neese would have been admissible.
 V
Since the evidence shows that Raines was not forced to take the life of the deceased in order to save his own life or limb from serious peril, and had no reasonable cause to entertain a belief of the necessity to take life, the instructions on self-defense were properly refused. Taylor v. State, 48 Ala. 180
(1872).
Although the trial judge charged the jury on the justification of self-defense, he "took the position that as a matter of law in this case there had been no evidence that would permit the Defendant to invoke self-defense", and "told the Defense Attorney that they could not argue self-defense because [he] hadn't heard any of those elements *Page 974 
[of self-defense] and you only argue what the evidence is."
In determining whether there was a danger so real or manifestly apparent as to create a reasonable belief on the part of a defendant of presently impending peril to his life or limb so as to justify a killing in self-defense, the "evidence most favorable to the defendant should be considered and if there is the slightest evidence tending to prove a hostile demonstration which can be reasonably interpreted as placing the accused, at the time of the killing, in apparent imminent danger to life or other grievous bodily harm then the matter of self-defense becomes a question of fact for the jury." Byrd v.State, 257 Ala. 100, 104, 57 So.2d 388 (1952) (emphasis added). As stated in Issue III, we are of the opinion that the evidence, when viewed in the light most favorable to Raines, is not sufficient to warrant the conclusion as a matter of law, that at the time Raines intentionally fired the fatal shot, either he or others were in actual or apparent impending peril of losing their life or of suffering grievous bodily harm.Miles v. State, 257 Ala. 450, 455, 59 So.2d 676 (1952).
It is not an invasion of the province of the jury for the court to determine whether, under the facts proven, the defendant may set up self-defense. Consford v. State,15 Ala. App. 627, 634, 74 So. 740, cert. denied, 200 Ala. 23,75 So. 335 (1917). "The court does not invade the province of the jury in a criminal prosecution by stating that there is or is not evidence of particular facts when such is the case." Colev. State, 352 So.2d 17, 20 (Ala.Cr.App.), cert. denied, Exparte Cole, 352 So.2d 20 (Ala. 1977).
Raines testified that he shot at the back of the car. He was not in a position to invoke self-defense for the reason that he was not in imminent peril. For this reason, the trial judge properly refused to allow defense counsel to argue self-defense to the jury and properly refused the requested instructions on self-defense. McWilliams v. State, 178 Ala. 68, 60 So. 101
(1912); Angling v. State, 137 Ala. 17, 21, 34 So. 846 (1903) ("The evidence, without dispute, establishes that the defendant shot the deceased in the back while the latter was in the act of running from him. . . . There, therefore, existed no necessity, real or apparent, which justified his conduct.");Wright v. State, 22 Ala. App. 376, 377, 115 So. 852 (1928) ("The death wound admittedly being near the center of the back of deceased would of necessity tend to show that, at the time the fatal shot was fired, the defendant could not have been in imminent danger of suffering death or grievous bodily harm at the hands of deceased."). See also Kizziah v. State,32 Ala. App. 197, 198-99, 23 So.2d 19 (1945); Riddle v. State,25 Ala. App. 142, 143, 142 So. 680, cert. denied, 225 Ala. 218,142 So. 682 (1932).
A court should not instruct on self-defense when there is no evidence to sustain the plea, Tarver v. State, 137 Ala. 29,34 So. 627 (1903), or when the defendant's evidence showed that he did not act in self-defense. Johnson v. State, 221 Ala. 632,130 So. 175 (1930). "As a general rule, the accused is not entitled to have his claim of self-defense submitted to the jury if the undisputed evidence shows clearly any of the following: that the accused was not in any actual or apparent imminent peril, . . ." McElroy, § 457.02 (5)(a).
 VI
Although the trial judge did charge the jury on the law of self-defense, he also instructed them that there was no evidence of self-defense.
 "I took the position that as a matter of law in this case there had been no evidence that would permit the Defendant to invoke self-defense. I defined self-defense to you so that you could determine for yourselves whether there had been any evidence. . . .
 "I told the Defense Attorneys they could not argue self-defense because I hadn't heard any of those elements and you only argue what the evidence is. And I explained what self-defense was for you *Page 975 
so that you could determine whether there had been any evidence of any of those elements."
Any error in charging on the doctrine or elements of self-defense is harmless where the evidence shows without conflict that the defendant could not invoke that defense.Brewer v. State, 160 Ala. 66, 49 So. 336 (1909); Owen v. State,418 So.2d 214, 223 (Ala.Cr.App. 1982).
 VII
In his oral charge to the jury, the trial judge inadvertently referred to Raines as "the prisoner at the bar" instead of the defendant. Defense counsel requested a mistrial. The judge denied this request and instructed the jury: "He is not a prisoner. I meant to say there the Defendant, Mr. Raines."
Here, there is a presumption against error because the trial judge corrected his mistake and properly instructed the jury.Kelley v. State, 405 So.2d 728, 729 (Ala.Cr.App.), cert. denied, 405 So.2d 731 (Ala. 1981).
 VIII
The trial judge properly refused to charge the jury on the offense of criminally negligent homicide. A judge should not charge the jury on an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense. Alabama Code § 13A-1-9 (b) (1975). Raines intentionally fired his weapon at a car passing his house. There was no negligent or inadvertent risk creation involved.Phelps v. State, 435 So.2d 158, 164-65 (Ala.Cr.App. 1983). There was no rational basis for a verdict of criminally negligent homicide.
 IX
The trial judge properly refused to charge the jury on the element of heat of passion. Under Alabama Code § 13A-6-2 (b), "[a] person does not commit murder . . . if he was moved to act by a sudden heat of passion caused by provocation recognized by law, and before there had been a reasonable time for the passion to cool and for reason to reassert itself." Here, there was no evidence that Raines was acting in the heat of passion.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.